UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------

|  |  |  |
|---|---|---|
| | : | |
| AHKEO LABS LLC, | : | CASE NO. 1:17-cv-1248 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | OPINION & ORDER |
| | : | [Resolving Docs. 19, 33, 40, 50, 64] |
| PLURIMI INVESTMENT MANAGERS, | : | |
| LLP., | : | |
| | : | |
| Defendant. | : | |
| | : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Ahkeo Labs LLC sues Defendant Plurimi Investment Managers LLP, claiming that Plurimi Investment breached a contract by failing to make a number of loans to Ahkeo.[1] Plaintiff Ahkeo has also moved to amend Plaintiff's Complaint to additionally sue Plurimi Wealth, a related company.

Plurimi Investment has filed two motions to dismiss, arguing that: (1) the Court lacks personal jurisdiction over Plurimi Investment, (2) the Northern District of Ohio is an inconvenient forum for resolving the dispute, and (3) Ahkeo has failed to join an indispensable party in violation of Rule 19 of the Federal Rules of Civil Procedure.[2] Plurimi Investment has also moved for summary judgment.[3] Ahkeo, for its part, opposes both motions and moves to amend its complaint.[4]

For the reasons that follow, the Court **GRANTS** Plurimi Investment's motion to dismiss for lack of jurisdiction. The Court **DENIES** as futile Ahkeo's motion to amend. And the Court **DENIES AS MOOT** Plurimi Investment's motion to dismiss under Rule 19, its motion for

---

[1] *See* Doc. 1.
[2] Docs. 19, 33.
[3] Doc. 64.
[4] Docs. 38, 50, 51. Plurimi Investment opposes Ahkeo's motion to amend. Doc. 57.

summary judgment, and its request that the Court dismiss this case based on the doctrine of forum *non conveniens*. [5]

# I. BACKGROUND

With this decision, this Court considers whether it has jurisdiction over a lawsuit against a British investment manager who does not have any American clients, offices, or investments but whose related company employed a junior employee who entered into a contract to provide a credit facility to an Ohio-sited company.

## A. Skoda's Relationship with Dupee

Some years ago, Brent Skoda, Plaintiff Ahkeo's chairman and CEO, met Alexander Dupee in Dallas through a friend of a friend.[6]  At the time of the first meeting, Skoda tried to convince Dupee and Dupee's father to invest in a venture called collegefitness.com.[7]  Dupee and his father weren't interested.[8]

Nonetheless, Skoda kept in touch with Dupee.[9]  In the Fall of 2016, Skoda and Dupee again met in London.[10]  Skoda was in London on other business, but had dinner with Dupee.[11]  Dupee lived and worked in London.  At that London dinner, Dupee allegedly represented that Dupee had "clients" who might invest in a marijuana vaporizer venture that Ahkeo hoped to grow.[12]

## B. Dupee and the Plurimi Entities

When Skoda and Dupee met in London, Dupee was working for Plurimi Wealth LLP. Plurimi Wealth employed Dupee as an associate director, which was nominally a "partner"-level

---

[5] Plurimi Investment also moved for relief from the expert identification deadline set in this Court's case management order.  Doc. 40.  As the Court has decided to dismiss this case on personal jurisdiction grounds and, in any event, the expert identification deadline has now passed, the Court **DENIES AS MOOT** the motion for relief.
[6] Doc 63 at 21, 23.
[7] *Id.* at 23.
[8] *Id.*
[9] *Id.*
[10] *Id.* at 23–24.
[11] *Id.* at 23.
[12] *Id.* at 24–25.

position but was in reality a lower-level position with the company.[13]

Although Dupee was nominally a partner at Plurimi Wealth,[14] Plurimi Wealth's partnership structure differs from Ohio partnership law. Dupee had no voting rights in Plurimi Wealth, held no equity in the firm, and had no authority to sign contracts on Plurimi Wealth's behalf.[15] Under Plurimi Wealth's structure, only its "designated partner" could bind Plurimi Wealth to contracts or sign contracts on Plurimi Wealth's behalf.[16] In essence, Dupee was nothing more than an ordinary employee subject to a special compensation arrangement.[17]

Plurimi Wealth provides investment advice to individuals and families.[18] It gives investment advice on roughly $3 billion, but is not the custodian for any of that money.[19] Instead, Plurimi Wealth's clients hold their money in their own bank accounts and Plurimi Wealth advises them regarding investments.[20] If the clients agree with a Plurimi Wealth recommendation, Plurimi Wealth will give transfer instructions to the clients' banks to make the recommended investments.[21] In most cases, the custodian banks then confirm the investment transfers with the bank customer.[22] Plurimi Wealth makes money by receiving a percentage of the money under management.[23]

Plurimi Wealth is headquartered in London; has no offices, employees, or clients in the United States; and is not licensed to give investment advice in the United States.[24] It does, however, sometimes advise its clients to purchase publicly traded U.S. securities.[25] Plurimi Wealth

---

[13] *See id.* at 66.
[14] *Id.*
[15] *Id.* at 66–67.
[16] *Id.* at 67.
[17] *See id.* at 66–67, 70–71.
[18] *Id.* at 62.
[19] *Id.* at 64–65.
[20] *Id.* at 65, 84.
[21] *Id.*
[22] *Id.* at 75.
[23] *Id.* at 86.
[24] *Id.* at 63–64; Doc. 1 at ¶ 2.
[25] *See* Doc. 63 at 64.

does not lend money.  Under British law, Plurimi Wealth is not licensed to make loans.[26]

Although Dupee was an employee of Plurimi Wealth, he was never authorized to give investment advice because Dupee had not passed the United Kingdom's licensure exams.[27] Instead of giving advice, Dupee performed administrative tasks—such as directing banks to transfer money at a clients' instruction—and helped market the firm to clients.[28]

Plurimi Wealth is a sister company to the Defendant, Plurimi Investment.[29]  At one time, "Plurimi Investment Managers" was a trade name for Plurimi Wealth.[30] But that was before Plurimi Investment was organized as a separate legal entity.[31]  Presently, Plurimi Investment manages two global micro-hedge funds.[32]

Dupee has never held any position with Plurimi Investment.[33]  Like its sister company, Plurimi Investment does not lend money, and is not licensed to make loans.[34]  It does not do business in the United States; it has no American offices, bank accounts, employees, or clients; and it is not licensed to market its funds in the United States.[35]

### C. Dupee Arranges Several Loans to Ahkeo

After Dupee expressed interest in Ahkeo at the London dinner, he and Skoda continued to communicate.  Phone records and text messages show conversations and loan negotiations.[36]  A number of these telephone conversations apparently involved calls between Skoda who was in Ohio and Dupee who was in London.[37]  Skoda testified that, throughout their exchanges, Dupee

---

[26] *Id.* at 65–66.
[27] *Id.* at 70.
[28] *Id.* at 36, 70–71; Pl's. Exh. 2.
[29] *See* Doc. 63 at 57–61.
[30] *Id.* at 61.
[31] *Id.*
[32] *Id.* at 58.
[33] *Id.* at 61.
[34] *Id.* at 59–60.
[35] *See id.* at 58–59.
[36] *See* Doc. 51-1 at 25–63.
[37] Doc. 63 at 30; Doc. 51-1 at 60–63.

represented that he was acting on behalf of the Plurimi entities.[38]

The tone of the text messages is not what one might expect in a transaction involving million dollar loans.[39]  For instance, Skoda repeatedly refers to Dupee as "brother," and Dupee at one point refers to Skoda as "bro."[40]  This short excerpt of the lengthy text message chain between the two men shows the informality of their "negotiations":

> DUPEE: Think you should make your way to dubai [sic].
> SKODA: See you in NY next weekend
> DUPEE: Or Abu Dhabi
> SKODA: I'm ready
> DUPEE: For the Grand Prix
> SKODA: Let's roll!
> DUPEE: Meet my clients
> DUPEE: And some others
> SKODA: Let's roll
> DUPEE: Party
> SKODA: Let's roll
> SKODA: Let's rock and roll sir[41]

And so on.

In any event, by October 2016, these negotiations had hardened into actual financing.  On October 18, Dupee arranged for one of his clients to make a $500,000 loan to Ahkeo and both he and Skoda executed a note for Ahkeo to repay the money.[42]  The October 18, 2016, note obligated Ahkeo to pay Alexander Dupee.[43]  The note does not mention the Plurimi entities and does not require Ahkeo to make any loan payments to the Plurimi entities.

A Dupee client funded this $500,000 October 18, 2016, loan.[44]  Dupee used his Plurimi Wealth email account to instruct his client's bank to transfer the money.[45]

---

[38] Doc. 63 at 27–32.
[39] *See id.* at 27–28.
[40] Doc. 51-1 at 26–27, 45, 54.
[41] *Id.* at 37–38.
[42] *Id.* at 65–70.
[43] Doc. 51-1 at 67.
[44] Doc. 63 at 39.
[45] Doc. 51-1 at 65.

On October 25, 2016, Ahkeo received another loan facilitated by Dupee.[46] In this October 25, 2016, ninety day loan, Nabeel Basaddiq loaned Ahkeo $1 million.[47] Nabeel Basaddiq is a Plurimi Wealth client that Dupee worked with at the firm.[48] The October 25, 2016, note does not mention the Plurimi entities and does not obligate Ahkeo to pay the Plurimi entities. Dupee again used his Plurimi Wealth email account to direct the client's bank to transfer the money to Ahkeo.[49]

On November 8, 2016, Ahkeo received another loan facilitated by Dupee.[50] In this November 8, 2016, ninety day loan, Samih Basaddiq loaned Ahkeo $3 million.[51] Samih Basaddiq is also a Plurimi Wealth client that Dupee worked with at the firm.[52] The November 8, 2016, note does not mention the Plurimi entities and does not obligate Ahkeo to pay the Plurimi entities. Just as with the earlier loans, Dupee used his Plurimi Wealth email to send directions to his client's bank.[53]

In each of these loans, the later loan repaid the earlier loan—essentially consolidating Ahkeo's debt from all three loan agreements.[54] The increasing loans also gave Ahkeo working capital. Skoda executed notes promising Ahkeo would repay the October 25, 2016, and November 8, 2016, loans.[55] For his troubles, Dupee apparently received $52,500 in commissions for arranging these loans.[56] None of these notes were payable to Plurimi Wealth. No evidence showed that Dupee paid any of this $52,500 commission to any Plurimi entity.

---

[46] *See id* at 74.
[47] *See id.*
[48] *See* Doc. 63 at 36, 70; Pl's Exh. 2.
[49] Doc. 51-1 at 72.
[50] *See id.* at 81.
[51] *See id.*
[52] *See* Doc. 63 at 36, 70; Pl's Exh. 2.
[53] Doc. 51-1 at 79.
[54] *See* Doc. 63 at 30, 33, 43.
[55] Doc. 51-1 at 74–77, 81–84.
[56] *See* Def.'s Exh. P, S.

## D. The Credit Revolver Agreement

On February 7, 2017, Skoda and Dupee met to complete negotiations on a credit revolver agreement that would formalize the series of revolving loans that began in October 2016.[57] The meeting took place in a conference room in Plurimi Wealth's London office.[58]

At the end of the negotiations, both Skoda and Dupee signed the credit revolver agreement.[59] Skoda and his attorney had prepared the initial draft of the agreement.[60] Under this agreement, Dupee and his "affiliates" agreed to provide two loans to Ahkeo: a $6 million loan to be made on February 7, 2017, and repaid on March 9, 2017; and a $9 million loan to be made on March 9, 2017, and repaid on April 9, 2017.[61] Dupee was to receive $105,000 in commissions for securing these two loans.[62]

When Dupee signed this agreement, he hand wrote Plurimi's headquarters as his address.[63] But neither the credit revolver agreement nor the promissory notes mentions either Plurimi entity.[64] Instead, the Credit Revolver Agreement said it was an agreement "between Ahkeo Labs, LLC, . . . and Alexander Dupee and such person's affiliates."[65]

Ahkeo never received any of the money promised in the revolver agreement.[66] Likely, Dupee could not find anyone willing to fund the next loan. And Ahkeo defaulted on the November

---

[57] *See* Doc. 63 at 31–33.

[58] *Id.* at 21–22; 25–26.

[59] Doc. 2.

[60] Doc. 63 at 53.

[61] *Id.* at ¶ 1.1. At the evidentiary hearing, Ahkeo contended that the agreement actually called for a series of revolving loans extending into perpetuity—or at least the foreseeable future. Doc. 63 at 103. But the revolver agreement simply does not say that. And, in any event, any dispute on this point is neither here nor there because the Court would lack personal jurisdiction either way.

[62] Doc. 2 at ¶¶ 1.1, 1.2. Despite the plain language of the revolver agreement, Ahkeo's June 2017 Balance Sheet indicates that Dupee is only owed $63,000 in commissions. Def.'s Exh. R. The Court is not sure where the $63,000 figure in that document comes from and, as a result, uses the language of the agreement.

[63] *Id.* at 5.

[64] *Id.*; Doc. 51-1 at 65–84.

[65] Doc. 2 at 1.

[66] Doc. 63 at 22; Doc. 1 at ¶ 25.

8, 2016, $3 million loan from Samih Basaddiq.[67]  Samih Basaddiq is pursuing collection of the $3 million load from Ahkeo.

Things didn't work out well for Dupee either.  His supervisors at Plurimi Wealth were unaware that Dupee had helped facilitate Plurimi client loans to Ahkeo.[68]  When his supervisors learned of Dupee's Ahkeo efforts, they were understandably upset.[69]  Plurimi Wealth and Plurimi Investment were not licensed to extend credit and lower-level-employee Dupee was not licensed to give investment advice.[70]  Dupee resigned before he could be fired.[71]

### E. Procedural History

In June 2017, Ahkeo filed this lawsuit against Dupee and Plurimi Investment.[72]  The Complaint alleged that Dupee and Plurimi Investment breached the revolver agreement by failing to provide the financing promised in that agreement.[73]  Ahkeo also brought a promissory estoppel claim and sought injunctive relief.[74]

Ahkeo later voluntarily dismissed its claims against Dupee.[75]

Plurimi Investment moves to dismiss for lack of personal jurisdiction.[76]  In addition, because the claims against Dupee have been dismissed, Plurimi Investment moves to dismiss because of Ahkeo's failure to join an indispensable party.[77]  Ahkeo opposes both motions.[78]  Plurimi Investment alternatively asks the Court to dismiss this case based on the forum *non*

---

[67] Doc. 63 at 43.
[68] *Id.* at 71–73.
[69] *See id.* at 72–73, 76–80.
[70] *Id.* at 59–60, 65–66, 70.
[71] *Id.* at 81.
[72] Doc. 1 at ¶ 25.
[73] *Id.* at ¶¶ 22–26.
[74] *Id.* at 18–21, 27–31.
[75] Doc 27.
[76] Doc. 19.
[77] Doc. 33.
[78] Doc. 38, 51, 52.

*conviens* doctrine.[79]  Plurimi Investment has also moved for summary judgment.[80]

Ahkeo has moved to amend its complaint to add Plurimi Wealth as a defendant and to supplement its original factual allegations.[81]  Plurimi Investment opposes.[82]

On February 7, 2018, the Court held an evidentiary hearing on the motion to dismiss for lack of personal jurisdiction.[83]

## II. PERSONAL JURISDICTION

### A. Legal Standard

"The plaintiff bears the burden of establishing the existence of jurisdiction."[84]  When, as in this case, the Court holds an evidentiary hearing on personal jurisdiction, the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence.[85]

To establish personal jurisdiction, a plaintiff in a diversity jurisdiction case must prove two things.  First, the plaintiff must show that personal jurisdiction exists under the law of the forum state—in this case Ohio.[86]  If the exercise of personal jurisdiction is permissible under state law, the plaintiff must then show that the exercise of personal jurisdiction would be consistent with the Fourteenth Amendment's due process guarantee.[87]

Ohio Revised Code § 2307.382, Ohio's long-arm statute, controls Ohio courts' personal jurisdiction.[88]  That section gives nine circumstances in which Ohio courts may exercise personal jurisdiction over a defendant.[89]  Those circumstance include cases where a defendant "transact[s]

---

[79] Doc. 19.  Ahkeo opposes that request.  Doc. 51.
[80] Doc. 64.
[81] Doc. 50.
[82] Doc. 57.
[83] Doc. 61.
[84] *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008).
[85] *Serras v. First Tenn. Bank Nat'l. Ass'n.*, 875 F.2d 1212, 1214 (6th Cir. 1989).
[86] *See MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899 (6th Cir. 2017); *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012).
[87] *See Schmuckle*, 854 F.3d at 899.
[88] *Conti v. Pneumatic Prods. Corp.*, 977 F.2d 976, 986 (6th Cir. 1992).
[89] O.R.C. § 2307.382(A)(1)–(9).

any business in th[e] state" or "contract[s] to supply services or goods in th[e] state."[90]

The Fourteenth Amendment permits the courts of a State (and by extension federal courts sitting in diversity) to exercise personal jurisdiction only where the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[91]  That test is satisfied in two situations.

First, a court might have general jurisdiction over a defendant.  "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."[92]  If a jurisdiction has general jurisdiction over a defendant, it can be sued in that jurisdiction by any plaintiff based on any claim, no matter where the events giving rise to that claim occurred.[93]

Second, in some circumstances, a court can exercise specific jurisdiction over a defendant. Specific jurisdiction exists where: (1) the "defendant purposefully availed [itself] of the privilege of acting in Ohio or causing a consequence in Ohio," (2) "the cause of action arises out of [the] defendant's activities in Ohio," and (3) "the exercise of jurisdiction over [the d]efendant is reasonable."[94]

### B. Ohio Long-Arm Statute

The parties dispute whether Ohio's long-arm statute permits the exercise of personal jurisdiction over the Plurimi entities.[95]  The Court does not address that question, because—even

---

[90] *Id.* § 2307.382(A)(1),(2).

[91] *Int'l. Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1941)).

[92] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (*quoting Int'l. Shoe Co.*, 326 U.S. at 317).

[93] *Costaras v. NBC Universal, Inc.*, 409 F. Supp. 2d 897, 904 (N.D. Ohio 2005) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445–47 (1952)).

[94] *Id.* at 905 (citing *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 794 (6th Cir. 1996)).

[95] Doc. 19-1 at 10–11; Doc. 51 at 11–13.

if Ohio's statute did allow for the exercise of personal jurisdiction—doing so would violate the Due Process Clause's guarantees.[96]

## C. Due Process Analysis

Defendant Plurimi Investment contends that the Due Process Clause prohibits the Court from exercising either general or specific jurisdiction over the Plurimi entities.[97] Plurimi Investment is correct. Both Plurimi Investment and Plurimi Wealth do not have sufficient connections to Ohio to support specific jurisdiction.

### 1. General Jurisdiction

Establishing that the Court has general jurisdiction over a defendant is an exceedingly difficult task. "[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there."[98] For a corporate defendant like Plurimi, the paradigmatic grounds for general jurisdiction are its (1) place or places of incorporation and (2) principal place of business.[99] While those are not the *only* bases of general jurisdiction, they do give a sense of the depth and breadth of contacts required to force a corporation to defend itself from all suits from all comers in a particular forum.[100]

To the extent that several vague statements in its complaint and proposed amended complaint were meant to do so,[101] Ahkeo does not show contacts even approaching the requirements to establish general jurisdiction.

Ahkeo does not contend that either Plurimi entity is incorporated in Ohio. Nor does Ahkeo

---

[96] *See King v. Ridenour*, 749 F. Supp. 2d 648, 652 (E.D. Mich. 2010); *Kinda Wood USA, LLC v. MGV Enters. LLC*, No. 2:07-cv-1137, 2008 WL 4425528, at *4 (S.D. Ohio Sept. 30, 2008).

[97] Doc. 19-1 at 11–18.

[98] *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014).

[99] *Id.*

[100] *Cf. id.* ("Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable. . . . These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.").

[101] Doc. 1 at ¶ 6; Doc. 50-2 at ¶ 6.

contend that Plurimi Investment or Plurimi Wealth has its principal place of business here. Indeed, it admits that both are incorporated and based in the United Kingdom.[102]

Ahkeo alleges only that the Plurimi entities "had continuous and systematic contacts with Plaintiff while Plaintiff was in Ohio for the purpose of transacting business."[103] Even if that is true, such "contacts" are not enough to establish general jurisdiction. Contact with a single customer in a State (and Ahkeo has made no allegation that Plurimi had other customers in Ohio) is simply not sufficient to render a defendant "essentially at home" in that State.[104] As a result, the Court cannot exercise general jurisdiction over either Plurimi Wealth or Plurimi Investment.

### 2. Specific Jurisdiction

Ahkeo contends that this Court has specific jurisdiction over Plurimi.[105] It reasons that Ahkeo and its CEO were Ohio based, that Ahkeo is located in Ohio, that Dupee communicated with Ahkeo and its officers while Ahkeo was located in Ohio, and that the money from the loans was destined for Ohio. Ahkeo then argues Plurimi those are sufficient minimum contacts with Ohio to support this Court's exercise of specific personal jurisdiction.[106] It is mistaken.

### a. Dupee's Apparent Authority to Bind the Plurimi Entities

As a preliminary matter, the parties disagree over whether Dupee's actions, and the resulting connections to the forum, can be attributed to Plurimi Investment or Plurimi Wealth.[107] If they cannot, personal jurisdiction is lacking because the Plurimi entities have no contacts with Ohio—or at least, no contacts that are related to this litigation—and cannot be said to have

---

[102] Doc. 1 at ¶ 3; Doc. 50-2 at ¶¶ 3–4.

[103] Doc. 1 at ¶ 6; Doc. 50-2 at ¶ 6.

[104] *See generally Goodyear*, 564 U.S. 915. Nor is it enough that Plurimi Wealth sometimes advises its clients to purchase U.S. securities and directs their banks accordingly. *See* Doc. 63 at 64, 92. A connection to U.S. securities markets is not a connection to Ohio. *cf. J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (plurality opinion) ("Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.").

[105] Doc. 51 at 13–19.

[106] *Id.*

[107] *See id.* at 11–13; Doc. 58 at 6–11.

purposefully availed themselves of the laws of Ohio. The Court finds that Dupee's actions cannot be attributed to either of the Plurimi entities.

The Court considers agency law when deciding if Dupee's actions can be attributed to either of the Plurimi entities. Specifically, because Dupee did not have actual authority to bind either Plurimi entity to the loan contract,[108] the question is whether he had apparent authority to do so.

### i. Choice of Law

But before reaching the apparent agency question, however, the Court must first determine which jurisdiction's agency law governs. There are three options: Ohio law (the law of the forum state); English law (the law of the jurisdiction where the revolver agreement was signed); and Delaware law (the law of the jurisdiction named in the contract's choice-of-law clause).

As this is a diversity case, the Court applies the choice-of-law principles of the State of Ohio.[109] Ohio courts apply Ohio law to contract disputes without undertaking a choice of law analysis unless the party seeking the application of a foreign jurisdiction's law establishes that there is "a genuine conflict between Ohio law and the law of the foreign jurisdiction."[110] This is so even where, as here, the contract at issue contains a choice-of-law clause.[111]

The parties have not briefed or argued the choice-of-law issue, let alone established a

---

[108] The Court credits the testimony of Ramzy Rasamny to the effect that Dupee had no actual authority to bind either Plurimi entity to the revolver agreement. Doc. 63 at 61, 66–67. That assertion is not seriously contested by Ahkeo, which confines itself to primarily arguing that, in a traditional partnership, a partner like Dupee could bind Plurimi Wealth. Doc. 51 at 11. Rasamny's testimony at the hearing concerning the actual corporate structure of Plurimi Wealth, Doc. 63 at 67–69, effectively rebuts that assertion and the Court finds him to be credible. Moreover, his testimony was bolstered by evidence showing that neither Plurimi entity is licensed to enter this sort of agreement. Def's Exhs. K, L.

[109] *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 185 (6th Cir. 2017) ("In a diversity case, we apply the choice-of-law principles of the forum State, here Ohio.").

[110] *Transp. Ins. Co. v. Busy Beaver Bldg. Ctrs., Inc.*, 969 F. Supp. 2d 875, 883–84 (S.D. Ohio 2013); *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006).

[111] *M.P. TotalCare Servs, Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 n.2 (N.D. Ohio 2009) (applying the actual-conflict requirement even where the contract at issue contained a choice-of-law clause); *Allstate Fire & Cas. Ins. Co. v. Moore*, 993 N.E.2d 429, 432–33 (Ohio Ct. App. 2013) (same).

genuine conflict of law.  And the Court's brief review of the issue suggests that there is no material difference between the law of Ohio, Delaware, and the United Kingdom as far as apparent authority is concerned.[112] As a result, the Court applies Ohio agency law to this matter.

### ii. Apparent Agency – Plurimi Investment

"Apparent authority arises when (1) 'the principal held the agent out to the public as possessing sufficient authority to act on his behalf,' (2) a 'person dealing with the agent knew these facts,' and (3) the person 'acting in good faith had reason to believe that the agent possessed the necessary authority.'"[113]  For apparent agency, the *principal* must hold the agent out as having authority for the transaction.[114]

Ahkeo fails to show that either Plurimi entity held Dupee out to the public as an agent empowered to enter the revolver agreement.  Dupee was never an employee of Plurimi Investment,[115] so it seems plain to the Court that there was no apparent agency as far as that entity is concerned.[116]

### iii. Apparent Agency – Plurimi Wealth

Ahkeo has moved to amend its complaint to join Plurimi Wealth (which did actually employ Dupee for a period of time) as a defendant.[117]  Plurimi Investment opposes that motion.[118]

In general, motions for leave to amend a complaint should be freely granted.[119]  But the Court may deny a motion to amend where the amendment would be futile—that is, where the

---

[112] *See e.g. Nee v. State Indus., Inc.*, 3 N.E.3d 1290, 1308 (Ohio Ct. App. 2013); *Finnegan Constr. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144–45 (Del. 1976); *Quinn v. CC Automotive Grp. Ltd.*, [2010] EWCA Civ. 1412, 2010 WL 5059245 (Eng.).

[113] *Nee*, 3 N.E.3d at 1308 (*quoting Ohio St. Bar Ass'n. v. Martin*, 886 N.E.2d 827, 834 (Ohio 2008)).

[114] *Id.*; *see also* Restatement (Third) of Agency § 2.03 cmt. c (2006).

[115] Doc. 63 at 61.

[116] To the extent that the use of a conference room in Plurimi's London headquarters or Dupee's statement in a text message to Skoda that he worked for "Plurimi," Doc. 51-1 at 26; Doc. 63 at 21–22, might suggest apparent agency, the Court addresses that connection below with regards to Plurimi Wealth.

[117] *See* Doc. 50.

[118] Doc. 57.

[119] Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend pleadings] when justice so requires.").

complaint would be dismissed even if the amendment were allowed.[120]

Plurimi Investment argues that leave to amend should be denied because even if Plurimi Wealth were added as a defendant and the factual allegations in the complaint were supplemented, the Court would still lack personal jurisdiction over either of the defendants.[121]   The Court agrees.[122]   Ahkeo hasn't shown that Dupee was Plurimi Wealth's apparent agent.

Ahkeo puts great weight on Dupee's alleged representations to Skoda.  In those alleged representations, Skoda says Dupee represented that Dupee had the authority to bring Plurimi Wealth clients into the revolver agreement Skoda also testified that Dupee represented that Dupee "ha[d] clients and resources where [he was] working." According to Skoda, "It was always Plurimi clients.  His clients and resources at Plurimi. . . . Through Plurimi, he was going to give us access to his clients."

Apart from Dupee's alleged representations, Ahkeo argues that Plurimi Wealth itself represented Dupee as having authority when Dupee used a Plurimi Wealth conference room.  Ahkeo also argues that Dupee handwritten use of Plurimi's address on the revolver agreement is, somehow, a Plurimi Wealth representation of Dupee's authority.

At best, the hearing evidence suggests that Dupee represented he could find a Plurimi client who would lend money.  But little shows Plurimi Wealth would lend money to Ahkeo.  And less shows that Plurimi Wealth itself ever held Dupee out as authorized to commit Plurimi Wealth to $15 millions of dollars of loans.

---

[120] *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017) ("Although a court should freely give leave to amend a complaint when justice so requires, it does not need to give leave if doing so would be futile, such as when the amended complaint cannot survive a motion to dismiss.").

[121] Doc. 57 at 5–6.

[122] At the evidentiary hearing, the Court suggested that the motion to amend would be granted.  Doc. 63 at 11–12.  That was because the court was not persuaded by Plurimi Investment's non-futility arguments against allowing the amendment (e.g. prejudice, undue delay), particularly because, throughout this litigation, the Plurimi entities have been cagey about their relationship to each other and Dupee.  The granting of the motion to amend was, of course, premised on Ahkeo's success in demonstrating the existence of personal jurisdiction over one or both Plurimi entities.  But for the failure to establish personal jurisdiction, the Court would likely have granted the motion to amend.

For one thing, none of the loan documents mention Plurimi.[123] The credit revolver agreement runs between Ahkeo and Dupee and Dupee's affiliates.[124] Plurimi is not mentioned. And the earlier promissory notes run between Ahkeo and individual lenders—namely Alexander Dupee, Nabeel Bassaddiq, and Samih Bassaddiq.[125] Plurimi is not mentioned in any of the notes. If Plurimi Wealth was itself going to lend money, the Court would expect Plurimi's name to appear somewhere in the loan documents or the credit revolver documents.

Ahkeo says the Credit Revolver Agreement required Plurimi to loan at least $15 million.[126] Skoda and his attorneys created the initial draft of the Credit Revolver Agreement and Skoda negotiated the terms with Dupee.[127] If he actually expected the Plurimi entities to loan such large amounts, logic suggests Plurimi would have been mentioned in the Credit Revolver Agreement.

The lack of any mention of Plurimi, along with the informal nature of the communications between Skoda and Dupee, leads the Court to believe that Skoda (and by extension Ahkeo) knew he was dealing with Dupee and Dupee's contacts on an individual basis, not negotiating with a sophisticated London financial advising firm. Moreover, Ahkeo transferred $52,500 in commissions to Dupee's personal account and promised to pay Dupee, $105,000 in additional commissions on the credit revolver agreement.[128] Ahkeo made no promise to pay a $105,000 payment to Plurimi Wealth. So the Court finds it unlikely that Dupee represented to Skoda that he was acting on behalf of Plurimi Wealth or that Skoda seriously believed that he was.

But even if Dupee had made representations to Skoda, they do not establish an apparent agency relationship with Plurimi Wealth. "A belief [in an agent's authority to enter an agreement]

---

[123] *Id.* at 40–41.
[124] Doc. 2 at 1.
[125] Doc. 51–1 at 67, 74, 81.
[126] Doc. 1.
[127] *See* Doc. 63 at 32, 53–54.
[128] Doc. 2 at ¶¶ 1.1, 1.2; Def.'s Exh. P.

that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority . . . ."[129]

Of course, Ahkeo protests that its apparent authority claim doesn't rest *solely* on Dupee's statements. But the Court find almost no evidence, apart from allowing Dupee to use a conference room for the February 7, 2017 meeting, that Plurimi Wealth held Dupee out as having authority to bind Plurimi Wealth to $6 million and $9 million loans..

Admittedly, the final revolver agreement negotiations used a Plurimi conference room.[130] But Plaintiff has offered no evidence of any Plurimi Wealth employee statements that Dupee had authority to require Plurimi to lend $15 million. Dupee was the only Plurimi person that Skoda spoke to about the loans before the revolver agreement fell through.[131]

Dupee apparently earlier offered the completed loan opportunity to a Plurimi client without knowledge or approval from his supervisor.[132] Importantly, Dupee personally received compensation for placing the earlier Ahkeo loans.[133] Dupee never gave those earlier commissions to Plurimi.[134] The credit revolver agreement required Ahkeo to pay $105,000 of commissions to Dupee, not Plurimi.[135]

That the final negotiations on the agreement took place in Plurimi Wealth's conference room is not enough to invest Ahkeo and Dupee's private bargain with the aura of apparent agency.

Nor is the Court persuaded that Dupee's use of his Plurimi Wealth email account to order

---

[129] *See* Restatement (Third) of Agency § 2.03 cmt. c (2006); *see also Martin*, 886 N.E.2d at 834 ("Under an apparent-authority analysis, an agent's authority is determined by the acts of the principal rather than by the acts of the agent. The principal is responsible for the agent's acts only when the principal has clothed the agent with apparent authority and not when the agent's own conduct has created the apparent authority.").

[130] Doc. 63 at 31.

[131] *Id.* at 22, 48–49. Skoda did testify to one social occasion in Abu Dhabi where he was introduced to other, unidentified members of the Plurimi entities as someone "we're doing business with," but that hardly amounts to a discussion of any loan agreement. *Id.* at 49.

[132] *See* Doc. 63 at 73–74, 76.

[133] *Id.* at 47; Def's Exhs. S, P, Q, R.

[134] Doc. 63 at 73–75.

[135] Doc. 2 at ¶¶ 1.1, 1.2.

the transfers of money for the October 18, October 25, and November 8 loans gives evidence that Plurimi Wealth held Dupee out as an agent empowered to enter the revolver agreement. For one thing, this was—once again—Dupee's action, not Plurimi Wealth's action. And for another, none of the emails in question were shown to be directed towards Skoda or any person affiliated with Ahkeo.[136] Indeed, there is no reason to believe Ahkeo or Skoda knew of these emails before obtaining them in discovery. Dupee's transfer instruction emails are not Plurimi's holding Dupee out as an agent empowered to enter loan contracts.[137]

### ii. Summary

Because Ahkeo fails to establish that Dupee was acting as either an agent or apparent agent of either Plurimi entity, none of Dupee's contacts with Ohio can be attributed to them. As a result, the Court would lack personal jurisdiction over the defendants in this case regardless of whether the Court granted Ahkeo's motion to amend. It follows that Ahkeo's complaint should be dismissed and its motion to amend denied as futile.

### b. Contacts between Dupee and Ohio

The Court further finds that, even if Dupee 's contacts with Ahkeo and Ohio could somehow be attributed to Plurimi Wealth,[138] there were insufficient contacts between Plurimi Wealth and the forum to support a finding that Plurimi Wealth purposefully availed itself of Ohio's laws.[139] The court, therefore, cannot exercise personal jurisdiction in this case and allowing Ahkeo to amend its complaint would be futile.

---

[136] Doc. 51-1 at 65, 72, 79.

[137] *See Martin*, 886 N.E.2d at 834 (explaining that, to prove apparent agency, the plaintiff must have known of the principal's acts holding an individual out as having authority to act as the principal's agent).

[138] As discussed above, there is no evidence at all to suggest that Dupee was ever an agent or apparent agent of Plurimi Investment. *See supra* at 11. So the Court does not address Plurimi Investment in this section. That said, even if Dupee were somehow an agent of Plurimi Investment, minimum contacts would still be lacking for the reasons set out in this section.

[139] *See Euroglas S.A*, 107 F.3d at 396 (indicating that the lack of sufficient contacts with the forum shows lack of purposeful availment).

### i. Lack of Meaningful Contacts with Ohio

First, Plurimi Wealth is a foreign corporation. And "the Supreme Court has held that '[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'"[140]

In arguing that exercising jurisdiction over Plurimi Wealth is, nonetheless, appropriate under the Due Process Clause, Ahkeo points to communications with Dupee and between Ohio and London.[141] But the Sixth Circuit has repeatedly made clear that such contacts are not enough to establish personal jurisdiction.[142] Dupee "presumably would have been pleased to communicate with" Ahkeo "wherever the latter wished."[143] "From [Dupee's] perspective . . . , it was purely fortuitous that [Ahkeo] happened to have a[n Ohio] address."[144]

Moreover, despite Ahkeo's protest to the contrary,[145] it is irrelevant that Ahkeo itself is an Ohio resident and that Dupee was aware of that fact. The Supreme Court makes clear that the plaintiff's contacts with the forum does not establish personal jurisdiction.[146] Equally insufficient is Dupee's knowledge that Ahkeo was from Ohio[147] and the fact that he signed a contract with an Ohio corporation.[148]

It is true, as Ahkeo points out, that the monetary injury in this case arguably occurred in

---

[140] *Beydoun v. Wataniya Rests. Holding*, 768 F.3d 499, 508–09 (6th Cir. 2014) (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 115 (1987)) (alteration in original); *see also Int'l. Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 388 (6th Cir. 1997).

[141] Doc. 51 at 12, 14, 16–17; Doc. 63 at 100–102.

[142] *Euroglas S.A.*, 107 F.3d at 395; *Kerry Steel, Inc. v. Paragon Indus. Inc.*, 106 F.3d 147, 151 (6th Cir. 1997); *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1295 (6th Cir. 1989).

[143] *See Euroglas S.A.*, 107 F.3d at 395.

[144] *See id.*

[145] *See* Doc. 51 at 13 (suggesting that these facts are relevant to the jurisdiction analysis).

[146] *Walden v. Fiore*, 134 S. Ct. 1115, 1122–25 (2014) ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.").

[147] *See LAK, Inc.*, 885 F.2d at 1301 ("Mere awareness that Beznos Realty and its legal counsel were from Michigan clearly was not enough.").

[148] *Kerry Steel, Inc.*, 106 F.3d at 151.

Ohio.[149] But that is only true because Ahkeo, the plaintiff, had Ohio bank accounts. The Supreme Court has rejected similar attempts to obtain personal jurisdiction by looking to where the plaintiff lacked access to funds.[150]

That the revolver agreement was apparently part of a continuing rather than one-shot relationship is also insufficient to establish jurisdiction.[151]

All of the truly significant contacts in this case occurred in the United Kingdom. That is where the contract was signed.[152] That is where the failure to pay funds occurred.[153] And that is where the defendants and Dupee were apparently located throughout the relevant periods. Any contact with Ohio was trivial and *de minimus*.

Plus, the revolver agreement's choice-of-law clause selects Delaware law, not Ohio law, to govern the agreement.[154] That is another reason not to exercise personal jurisdiction here.[155]

In short, the relevant background militates against the exercise of personal jurisdiction. The contacts that Ahkeo identifies pointing in the other direction are not sufficient to establish personal jurisdiction.

### ii. Analogous Cases

Indeed, as Plurimi Investment suggests,[156] this case is on all fours with the Sixth Circuit's

---

[149] Doc. 51 at 15. Although Ahkeo also attempted to suggest that it sent Dupee's commission payments to Dupee's "Plurimi[ ] Barclays' account," Doc. 63 at 31, there is no evidence other than Skoda's say-so that Dupee's Barclays account is connected to Plurimi. Indeed, other evidence presented at the evidentiary hearing shows that the account was a personal account. *Id.* at 47; Def's. Exhs. S, P, Q, R.

[150] *See Walden*, 134 S. Ct. at 1125 ("Respondents (and only respondents) lacked access to their funds in Nevada not because anything independently occurred there, but because Nevada is where respondents chose to be at a time when they desired to use the funds seized by petitioner. Respondents would have experienced this same lack of access in California, Mississippi, or wherever else they might have traveled and found themselves wanting more money than they had."); *see also Kerry Steel, Inc.*, 106 F.3d at 151; *LAK, Inc.*, 885 F.2d at 1302–03.

[151] *See Euroglass S.A.*, 107 F.3d 386.

[152] Doc. 63 at 22.

[153] *See id.* at 22; Doc. 1 at ¶ 3; Doc. 50-2 at ¶¶ 3–4; *see also Kerry Steel, Inc.*, 106 F.3d at 152 (attaching some jurisdictional significance to the fact that "[t]he refusal to pay occurred in Oklahoma.").

[154] Doc. 2 at ¶ 7.6.

[155] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *LAK, Inc.*, 885 F.2d at 1295.

[156] Doc. 19-1 at 15–16; Doc. 58 at 15–19.

decision in *Kerry Steel*. In that case, a Michigan company approached an Oklahoma company and offered to sell it steel coils.[157] After the Oklahoma company took possession of the coils in Illinois, it refused to pay the Michigan company.[158] The Sixth Circuit rejected the Michigan company's argument that a Michigan district court could exercise jurisdiction over the Oklahoma company.[159] And the Sixth did so despite the fact that (1) the Oklahoma company entered a contract with a Michigan company, (2) the Oklahoma company called and sent faxes to Michigan, and (3) the Michigan company's financial injury took place in Michigan.[160]

Ahkeo attempts to distinguish *Kerry Steel* by pointing out that the relationship in that case was an isolated transaction, not part of a continuing relationship.[161] And that is true. But any attempt to differentiate this case from *Kerry Steel* on that basis runs squarely into the Sixth Circuit's *Euroglass* decision.

In *Euroglass*, a Michigan corporation coordinated the design of a manufacturing plant in France under an agreement with a Swiss company that was signed in Switzerland.[162] The Michigan corporation then sued the Swiss company for, among other things, appropriating its designs without paying for them.[163] Despite the fact that (1) there was a continuing relationship between the parties, (2) the Swiss company had made payments to the Michigan company in Michigan, (3) there were communications back and forth from Michigan to Switzerland, and (4) employees of the Swiss corporation made occasional visits to the Michigan company, the Sixth Circuit held that the Michigan district court did not have personal jurisdiction over the Swiss company.[164] Indeed, the defendant's contacts with the forum in *Euroglass* are so markedly more significant than the

---

[157] *Kerry Steel, Inc.*, 106 F.3d at 148.
[158] *Id.*
[159] *Id.*
[160] *Id.* at 151.
[161] Doc. 51 at 17; *Kerry Steel, Inc.*, 106 F.3d at 151.
[162] *Euroglass S.A.*, 107 F.3d at 388–89.
[163] *Id.* at 387, 389.
[164] *Id.* at 392–95.

contacts between Plurimi Wealth and Ohio that the Sixth Circuit's decision in that case forecloses any exercise of jurisdiction here.

### iii. *Cole v. Mileti*

Lastly, Ahkeo's reliance on *Cole v. Mileti*[165] is unavailing.  In that case, Cole (an Ohio resident) bought stock in and lent money to a motion picture production, using a loan from a bank to finance the investment.[166]  After the film was a flop, Mileti (a resident of California) reached out to Cole to purchase Cole's interest in the film.[167]  Communications passed back and forth between Ohio and California, the parties signed the contract in their respective home states, and then Mileti failed to live up to his end of the bargain.[168]  The Sixth Circuit found that an Ohio district court could exercise jurisdiction over Mileti because of his solicitation of Cole in Ohio and the communications back and forth between Mileti and Ohio.[169]

But in that case, Mileti (the defendant) had initiated contact with the Ohio plaintiff to Ohio to solicit an agreement.  The Court is not convinced by Skoda's testimony that Dupee did something similar in this case.

According to Skoda, he happened to bring a slide show presentation about Ahkeo's vaporizer with him to London.[170]  Then, Skoda happened to bring it with him to Dupee's home for dinner.[171]  Then, when Skoda briefly left to go to another appointment, he happened to leave the presentation on Dupee's coffee table.[172]  Then, Dupee happened to look at it.[173]  Then, by a twist of fate, Skoda's brother happened to still be around to talk to Dupee about the presentation when

---

[165] *Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998).
[166] *Id.* at 435.
[167] *Id.*
[168] *Id.*
[169] *Id.* at 436.
[170] *Id.* at 23.
[171] *Id.*
[172] *Id.* at 23.
[173] *See id.* at 23–24.

Dupee picked it up.[174]  Then, to Skoda's complete surprise, when he came back later that evening,

Dupee expressed interest in investing in Ahkeo.[175]

It is more likely that Skoda went to London intending to ask Dupee to invest in Ahkeo (as

he had asked him to invest in at least one prior venture),[176] did solicit investments from him, and

was successful (at least at first).  In any case, no credible evidence shows that Dupee reached into

Ohio seeking to invest in Ahkeo.[177]

Moreover, even if Dupee had brought up investing in Ahkeo first, he did so at a dinner *in

London*, so he couldn't be said to have reached out to Ohio.  Again, contact with the plaintiff is

not contact with the plaintiff's home forum.[178]

### iii. Summary

As a result, even if Dupee's conduct could somehow be attributed to Plurimi Wealth,

Ahkeo does not show that the Due Process Clause permits the Court to exercise personal

jurisdiction over Plurimi Wealth.  And its proposed amended complaint does nothing to remedy

that failure.  It follows that Ahkeo's complaint should be dismissed for lack of personal jurisdiction

and its motion to amend denied as futile.

### III. OTHER ISSUES

Granting Plurimi Investment's motion to dismiss for lack of personal jurisdiction moots its

motions to dismiss for failure to join an indispensable and based on the forum *non conveniens*

---

[174] *Id.*

[175] *Id.* at 24.

[176] *See* Doc. 63 at 23.

[177] Likewise, *American Greetings Corp. v. Cohn*, 839 F.2d 1164 (6th Cir. 1988), has no application here. *American Greetings* involved a dispute between a shareholder (the defendant) and management as to how a company should be run.  *Id.* at 1165.  In that case, too, the defendant reached out to the plaintiff in the forum.  *Id.* at 1170. Moreover, in addition to communicating with the Ohio plaintiff, the defendant had purchased stock in the company and designated representatives to meet with plaintiff's corporate officers in Ohio.  *Id.* Those contacts are more significant and relevant to the litigation than the contacts here.

[178] *Walden*, 134 S. Ct. at 1122–25 (2014).  The Court also notes that if *Cole* would conflict with *Kerry Steel* and *Euroglas* if it were not distinguishable in this case.  Because those cases were decided before *Cole*, the Court would be bound to enforce their holding rather than *Cole*'s.  *Sowards v. Loudon Cnty*, 203 F.3d 426, 431 n.1 (6th Cir. 2000) ("When a later decision from this court conflicts with its prior decisions, the earlier cases control.").

doctrine. Doing so also moots Plurimi Investment's motion for summary judgment.

## IV. CONCLUSION

For all of those reasons, the Court **GRANTS** Plurimi's motion to dismiss for lack of personal jurisdiction. The Court **DENIES** as futile Ahkeo's motion to amend the complaint. And the Court **DENIES AS MOOT** Plurimi's motion to dismiss for failure to join an indispensable party, its request that the case be dismissed based on the doctrine of forum *non conveniens*, and its motion for summary judgment.

Ahkeo's complaint is, therefore, **DISMISSED WITHOUT PREJUDICE** to its being filed in an appropriate forum with personal jurisdiction over the parties.

IT IS SO ORDERED

Dated: February 27, 2018                    *s/       James S. Gwin*
                                                    JAMES S. GWIN
                                                    UNITED STATES DISTRICT JUDGE